## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

| | |
|---|---|
| Metrom Rail, LLC<br><br>                Plaintiff,<br><br>v.<br><br>Massachusetts Bay Transportation Authority and Piper Networks, Inc,<br><br>                Defendants. | No. _____<br><br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff, Metrom Rail, LLC ("Metrom" or "Plaintiff"), alleges the following:

## SUBJECT MATTER JURISDICTION

1.      This action arises, in part, under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332, 1338, and 1367.

## PERSONAL JURISDICTION

2.      Defendant Massachusetts Bay Transportation Authority ("MBTA"), a division of the Massachusetts Department of Transportation ("MassDOT"), "is a political subdivision of the Commonwealth [of Massachusetts] and a body politic and corporate" subject to general personal jurisdiction in Massachusetts. *See Mass. Bay Transp. Auth. v. City of Somerville*, 883 N.E.2d 933, 935 (Mass. 2008)

3.      Defendant Piper Networks, Inc. ("Piper") is a Delaware corporation with a headquarters in San Diego, California that is subject to specific jurisdiction in Massachusetts under Mass. Gen. Laws Ch. 223A, § 3. Piper has purposefully availed itself of the privileges of conducting business in the State of Massachusetts; Piper deliberately and regularly conducts continuing and ongoing business within the State of Massachusetts, and Metrom's cause of action arises directly from Piper's business contacts and other activities in the State of Massachusetts, including at least by virtue of Piper's infringing systems, devices, and methods, which are at least made, sold, practiced, and/or used in the State of Massachusetts including by the MBTA. Further, on information and belief, Piper is subject to the Court's jurisdiction, including because Piper has committed patent infringement in the State of Massachusetts.

4.      This Court also has general jurisdiction over Piper because its contacts with the State of Massachusetts are of a sufficient and continuing nature to warrant the exercise of general personal jurisdiction over Piper.

## VENUE

5.      Venue is proper under 28 U.S.C. §§ 1391(b)-(d) and 1400(b).

6.      Joinder of the Defendants the MBTA and Piper (collectively, "Defendants") in this action is proper under 35 U.S.C. § 299 because the claims

herein arise from a common nucleus of operative facts related to the same transaction or series of transactions.

7.      Assignment to the Boston division is proper since the MBTA is headquartered at 10 Park Plaza, Boston, MA and Piper has engaged in the transaction that gives rise to the causes of action in this Complaint at the MBTA headquarters and other locations in and around the Boston division.

## THE PARTIES
### Metrom

8.      Metrom is a pioneer in the area of decentralized train control with Ultra Wide Band ("UWB") technology. Founded in 2010, Metrom is an Illinois Corporation with a headquarters in Lakemoor, Illinois.

9.      Railroad equipment is heavy and can travel at speeds over 80 miles per hour while pulling railcars filled with people. While generally very safe, accidents do happen. For example, as recently as February 9, 2025, an in-service MBTA Green Line train hit an out-of-service Green Line train in Somerville, Massachusetts. *See* Asher Klein, *MBTA Green Line Train Passed Stop Signal Before Crash in Somerville, NTSB Says*, NBC Bos. (March 6, 2025), https://www.nbcboston.com/news/local/somerville-green-line-crash-ntsb-report/3650526/. According to the National Transportation Safety Board ("NTSB"),

before the crash, the in-service train was going 32 mph in a 25 mph zone, then passed a red signal indicating the train should stop. *Id.*

10.    Metrom has developed the innovative "AURA" system and other worker and railway equipment protection products using UWB for new and existing rail systems. Metrom's products are designed, built, and tested in Illinois.

11.    Historically, railroads have implemented complex and expensive systems to avoid accidents. Despite these systems, accidents still occur, and the traditional suppliers of signal systems have not fielded low cost, reliable train control systems for precisely locating and controlling commuter trains in high traffic, urban rail environments.

12.    In 2012, Metrom introduced its first AURA brand product and the first commercially successful application of UWB in the railroad environment, a collision avoidance system for railroad maintenance of way ("MOW") vehicles.

13.    Railroad MOW equipment is especially subject to collisions because the equipment tends to operate in groups of small but independently powered and operated vehicles in "work trains" with close spacing. For example, a series of machines for performing different kinds of maintenance on the rail bed, cross ties, and rails. Collisions are surprisingly frequent, since workers are focused on their

maintenance work, sightlines on the equipment are poor or obstructed, and the equipment is operated in close proximity with frequent starts and stops.

14.    Metrom initially used its collision avoidance technology to solve the problem of MOW collisions by equipping each unit with UWB radios that accurately determine the range to the MOW vehicle ahead and automatically warns the operator or brakes the MOW equipment if the operator does not act within a margin of safety. Metrom filed for and obtained patents on this system, including U.S. Patents Nos. 8,812,227 and 9,043,131 (Ex. A).

15.    Since its introduction, Metrom's AURA system has been installed on over 3,000 railroad maintenance vehicles in the U.S. and Canada, with overall reductions in incidents of 90% or greater and no collisions between equipped vehicles when the system was properly installed, maintained, and used, avoiding countless injuries and saving millions of dollars in equipment damage.

16.    In 2013, Metrom began exploring ways to expand its successful collision avoidance system to the mass transit context. Urban mass transit is an environment with some characteristics similar to the MOW environment, with close headways and high numbers of trains. At peak periods, it is desirable for transit agencies to allow trains to run as close together as possible.

17.    Traditional signal control for mass transit rail divided train lines into a series of fixed track segments ("blocks"), with complex, cumbersome equipment designed to prevent two trains from entering the same fixed section of track at the same time. Smaller blocks allow for higher volume but each block adds additional signals, controls, and points of failure for maintenance.

18.    In the 1980s, systems were developed that allowed for "moving" blocks that allowed a moving buffer region before and after a train. Only a handful of companies in the world offer these systems for transit agencies. The offering in the U.S. is known as "Communications Based Train Control" or CBTC. To meet safety requirements, legacy CBTC systems employed complex networks of track side equipment that communicated train status to a central control point, which would communicate authority to operate to each train. The technology is subject to large positional errors, prone to failure, and, while it is an improvement on fixed block systems, it is very costly for even small improvements in performance. For example, the QBL East project in New York was awarded to a supplier for $346 million despite it being a relatively small segment of the NYCT subway system. *See* Ex. C ("Piper Signal Modernization Whitepaper") at p. 3.

19.    To meet the need for a lower cost, reliable train control system, Metrom extended the technology found in its AURA MOW collision avoidance system to

create the AURA Train Control System. *See, e.g.*, *AURA Train Control System*, Metrom Rail, https://metrom-rail.com/AURA-TCS (last visited May 22, 2025). Shown below are the hardware components of this system.



20.    In this system, the AURA carborne unit in one train uses UWB communications with AURA carborne units in other trains and wayside equipment to identify the exact position of the train in reference to its location within a system, along with its relative distance to other trains, signals, work zones, or other key features.

21.    Metrom also developed the CERTIS train localization system. CERTIS uses Carborne and Wayside UWB modules to provide vital train position, speed, direction of movement, consist length, and track occupancy data. *See, e.g.*, *CERTIS*

*Train Localization System*, Metrom Rail, https://metrom-rail.com/CERTIS (last visited May 22, 2025).

22.    Metrom applied for and secured patents directed to this novel system including U.S. Patent No. 9,731,738 (Exhibit B).

23.    Over time, Metrom has bid for and won several projects for train collision avoidance systems.

24.    Metrom frequently teams with larger integrators like Parsons Transportation Group, Inc. ("Parsons") and Kiewit Corporation when bidding for projects. As part of these "Teaming Agreements," Metrom provides the integrators with access to the technical details of its AURA technology.

25.    For example, when bidding for MBTA RFP 24-16, Metrom teamed with Parsons. Parsons' engineers, project managers, and executives were given access to Metrom's AURA technology. Parsons' work with Metrom and the team's subsequent proposal to the MBTA were confidential under written agreements with Parsons.

26.    Piper Networks hired two individuals from this Parsons team and has placed one of them as the lead Piper representative on its project for the MBTA.

27.    Metrom believes, or believes it will likely have evidentiary support after an opportunity for discovery, that Piper used the former Parsons engineers to develop and field its own collision avoidance system that mimics the systems previously developed by Metrom.

28.    In the claim charts that follow, Metrom identifies a response in the Defendants' systems for each limitation of each identified claim. Each row is an allegation under Fed. R. Civ. P. 8(b)(1)(B) that must be admitted or denied.

**Piper Networks**

29.    Piper is incorporated in the state of Delaware and has a headquarters at 3636 Nobel Drive, Suite 300, San Diego, CA 92122.

30.    Piper represents that it has locations in New York City, Wilmington, DE, Dallas, TX and Atlanta, GA.

31.    Piper holds itself out as a rail engineering solutions provider and systems integrator specializing in the development of transportation technologies.

32.    Piper did not enter the business of providing rail engineering solutions and systems integration until after Metrom developed, introduced, and proved the viability of the solutions described above.

33.    Piper implicitly acknowledged the validity of Metrom's inventions by filing its own patent applications well after Metrom had introduced the technology, starting in about September of 2019.

34.    Piper offers for sale an Automatic Train Protection-Overlay ("ATP-O") solution that purportedly can be added to the existing railway infrastructure and signaling systems. *ATP-Overlay*, Piper Networks, https://www.pipernetworks.com/atp-overlay/ (last visited May 22, 2025).

35.    Piper uses its Rail Positioning System ("RPS") in its ATP-O solution.

36.    In addition to offering infringing systems to the MBTA, Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that Piper has offered infringing systems to other transit agencies or rail operators.

37.    Piper's RPS uses UWB radio ranging to determine the precise location of trains. There are two UWB radio types used in RPS: carborne devices called "tags" and wayside devices called "anchors."

38.    Piper represents that the figure below is Piper's comprehensive diagram of the RPS components and their integration with CBTC and Data Communication Systems ("DCS") equipment. Piper represents that tags are installed in each unit of

the train. The train is represented in a multiunit configuration—A1/B1/B2/A2—with UWB communication occurring in the A1/A2 cars via the red tags shown at each corner. *See* Ex. C ("Piper Signal Modernization Whitepaper") at pp. 5-6.



Figure 1 Piper Onboard Architecture

39.     Piper represents that the interaction between Piper wayside anchors mounted on the wayside and Piper tags installed on the vehicle facilitates the geolocation of the train. Piper represents that these interactions use UWB signals. Piper represents that the distance is measured between anchors and tags using a calculation based on the Time-of-Arrival of the UWB radio pulse. Piper represents that Piper's navigational computers called tag controllers use the ranging data, the

known positions of the anchors, and the database of the mathematical model of the track to compute the train's location. Piper represents that the tag controller then produces a UDP packet, formatted to meet CBTC requirements, and injects the positioning and speed data into the Onboard Controller Unit ("OBCU").

40.    Piper represents that the use cases for its RPS and ATP-O include overspeed protection and brake assurance.

41.    Piper also represents that its RPS and ATP-O solutions allows for emergency braking functionality that can be activated in response to breach of several protection rules.

## MBTA

42.    The MBTA provides subway, bus, commuter rail, ferry, and paratransit service to eastern Massachusetts and parts of Rhode Island. *See How to Ride the MBTA: The Basics*, Mass. Bay Transp. Auth., https://www.mbta.com/about/how-to-ride-the-mbta-the-basics (last visited May 22, 2025).

43.    The MBTA has the power to "sue and be sued in law and equity and to prosecute and defend all actions relating to its property and affairs." Mass. Gen. Laws Ch. 161A, § 2.

44.     The subway lines include the Red, Orange, Blue, and Green lines that provide connections to and from Boston and surrounding cities, including Cambridge, Newton, Revere, and Quincy. *How to Ride the MBTA: The Basics*, Mass. Bay Transp. Auth., https://www.mbta.com/about/how-to-ride-the-mbta-the-basics (last visited May 22, 2025).

45.     The Green Line is a light rail system including both above ground and tunnel service and has four branches (B, C, D, and E lines). *See Subway*, Mass. Bay Transp. Auth., https://www.mbta.com/schedules/subway (last visited May 22, 2025).

46.     On April 3, 2014, the MBTA issued an invitation for proposal for a prototype demonstration of a light rail collision avoidance system. *See* Ex. D ("RFP No. 57-14.").

47.     Metrom submitted a confidential proposal and successfully demonstrated certain components of a collision avoidance system for the MBTA.

48.     On October 16, 2016, the MBTA issued a request for proposals, RFP 24-16, for a Green Line Train Protection System, the 24-16 GLTPS. Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that RFP 24-16 was issued along with Technical Specification VE-16-045.

49. Subsequently, the MBTA issued several addendums to RFP 24-16. On January 18, 2018, the MBTA issued amendment 8 to RFP 24-16. *See* Ex. E ("RFP 24-16, January 8, 2018, Amendment 8"). Concomitantly, the MBTA also issued Addendum 8 to Technical Specification VE-16-045. *See* Ex. F ("VE-16-045, Addendum 8 – January 8, 2018").

50. Metrom/Parsons and BBR Verkehrstechnik/United Rail were among the bidders for 24-16 GLTPS. The bid submissions were confidential. BBR Verkehrstechnik was awarded the project. *See* Railway Age Staff, *MBTA Tabs BBR, United Rail for Green Line Protection System*, Ry. Age (July 5, 2017), https://www.railwayage.com/news/mbta-tabs-bbr-united-rail-for-green-line-protection-system. After many delays, the MBTA cancelled the project because, on information and belief, BBR was unable to deliver on the contract requirements with BBR's alternative to Metrom's patented technology. *See* Gayla Cawley, *Green Line Anti-Collision System Won't Be Done Until 2025*, Bos. Herald (Jan. 20, 2023), https://www.bostonherald.com/2023/01/19/old-green-line-trains-hinder-mbta-efforts-to-install-crash-prevention-technology/.

51. On or around June 7, 2024, the MBTA issued a request for proposals soliciting bids for a stand-alone, non-vital overlay system to provide a Green Line Train Protection System ("GLTPS"). Ex G ("RFP NO. 80F-24") at p. 10. The

primary functions of this system are to prevent collisions between trains and to stop Green Line Vehicles before they pass a Red Signal. *Id.*

52.    The MBTA required that the proposed GLTPS comply with Technical Specification VE-24-056 ("Technical Specifications" or "Specifications" or "TS") that the MBTA published. *Id.*

53.    The Technical Specifications, (Ex. H), and all attachments were posted with the RFP on the Commonwealth of Massachusetts' COMMBUYS site, www.commbuys.com. *Id.* at p. 85.

54.    The bidder awarded the contract (the "Contractor") for the GLTPS is required to provide Carborne, Wayside, and Back-Office equipment for the GLTPS. Ex. H ("Technical Specification VE-24-056") at §1.1.7.

55.    The MBTA requires the Contractor to design the GLTPS and manage, integrate, and install Carborne kits and back-office equipment. Ex. G at p. 10.

56.    The MBTA also requires the Contractor to manage and integrate wayside equipment and oversee the installation and commissioning of the Wayside equipment by a third-party contractor. *Id.*

57.    Bid submissions were confidential. Upon information and belief, on August 7, 2024, Piper Networks responded to RFP 80F-24 with its bid for the

GLTPS, hereinafter the "Piper GLTPS." *See* Ex. I ("Transition Planning Presentation," ("TPP")) at p. 6.

58.    Upon information and belief, sometime in October 2024, the MBTA Executive Team recommended that Piper Networks progress to "Design & Production Readiness" phase with its Piper GLTPS. *See id.*

59.    Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the Piper GLTPS is a UWB-based radio communication-based system utilizing carborne and wayside equipment to determine train position to enforce operating speed listed in the MBTA database, provide train-to-train communication to detect impending collisions and determine status of upcoming signal to prevent red signal overruns. *See id.* at pp. 4 and 5.

60.    Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the Piper GLTPS is materially similar to its Rail Positioning System (RPS) as used in its ATP-O solution. *See* ¶¶34-35, *supra*.

61.    The "Design & Production Readiness" phase requires that the Contractor demonstrate that the proposed GLTPS fulfill the primary functions. *See* Ex. G at p. 11.

62.     The MBTA sought the approval of its Board of Directors to award RFP 80F-24 Green Line Train Protection System contract to Piper Networks, Inc. subject to a successful "Design & Production Readiness Demonstration" for $112,529,564. Ex. I at p. 9.

63.     Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the Piper GLTPS fulfills the primary functions as specified in the Technical Specifications. Specifically, Piper Networks made and used the Piper GLTPS on the Westbound track between Medford/Tufts to Haymarket. *See id.* at p. 4.

64.     Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the Piper GLTPS includes tags mounted in vehicles, anchors located along the track and tag controllers. *See* ¶¶36-41, *supra*.

65.     Upon information and belief, the total budget for the GLTPS is about $219 million. *See* Ex. I at p. 8. Of this total, approximately $112 million is allocated for materials and services to be provided by Piper Networks. *See id*.

66.     On or around February 26, 2025, the MBTA board approved a $113 million contract with Piper Networks to deliver its GLTPS. *See, e.g.*, James Rojas, *'GLTPS': MBTA to Install Crash-Prevention Technology on Green Line*, WBZ

News Radio 1030 (Feb. 26, 2025), https://wbznewsradio.iheart.com/content/gltps-mbta-to-install-crash-prevention-technology-on-green-line/.

67.     On information and belief, Piper will manufacture, furnish all labor, management, materials, tools, services, parts, data, systems, equipment, other items and incidentals which are necessary to complete the Work including additional functionality described in RFP 80F-24. *See* Ex. I at p. 9.

68.     Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that Defendants Piper Networks and the MBTA are coordinating the installation and maintenance of the Piper GLTPS.

## COUNT I – PATENT INFRINGEMENT, U.S. PATENT NO. 9,731,738 – ALL DEFENDANTS

69.     The allegations in the preceding paragraphs are incorporated herein.

70.     This claim is brought under 35 U.S.C. § 281 and the court has original and exclusive jurisdiction under 28 U.S.C. § 1338.

71.     Metrom is the owner of duly issued U.S. Patent No. 9,731,738 ("the '738 patent") (Ex. B) titled "Rail Vehicle Signal Enforcement and Separation Control" and has been the owner at all times material to this claim.

72.    Defendant Piper has long known of the '738 patent and its applicability to Piper's system, having received prior notice of the '738 patent and Piper's alleged infringement as early as 2019, and also by being involved in prior failed efforts to invalidate the '738 patent.

73.    Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the MBTA was previously aware of the '738 patent and its applicability to the Green Line train protection project., having received notice of the '738 patent and its applicability to the system at least through Metrom's prior bid for the project.

74.    Where implemented on the MBTA Green Line, the Piper GLTPS will infringe at least one claim of the '738 patent, either literally or by equivalence, either alone or as installed in the MBTA system. The following table recites each limitation of at least one claim and the corresponding response in the accused system:

| Claims 1-8, 10, 12-14 of the '738 patent | Defendants' System |
|---|---|
| 1. A system for evaluating vehicle operation compliance, wherein the system comprises: | The GLTPS as specified by the MBTA is a system for evaluating vehicle operation compliance. Specifically, the MBTA specifies the GLTPS as "a stand-alone, non-vital overlay system with the primary functions of  (i) Stopping Green Line Vehicles before they pass a Red Signal (or other Stop signal); (ii) Speed enforcement of Green Line Vehicles to authorized speed limits; (iii) preventing train-to-train collisions on tracks used for passenger service; and  (iv) |

| Claims 1-8, 10, 12-14 of the '738 patent | Defendants' System |
|---|---|
| | Preventing incursions into roadway work zones." Ex. H at §1.1.3.

The GLTPS consists of Carborne equipment, Wayside equipment, and Back-Office equipment. Ex. H at §2.1.9.

If the Carborne equipment mounted in the train car receives communication from the Wayside equipment that the train is approaching a STOP aspect, the Carborne equipment shall request a STOP, *if the Operator does not initiate braking in sufficient time to ensure the train is brought to a complete stop prior to passing the STOP aspect*. Ex. H at §2.2.6 (emphasis added). Thus, the GLTPS evaluates vehicle operation compliance.

Piper was awarded the contract to implement the GLTPS as specified in the Technical Specifications. *See* Ex. I at p. 6.

Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that Piper has implemented the Piper GLTPS on the MBTA Green Line as specified in the Technical Specification as part of the "Design & Production Readiness" and will implement the Piper GLTPS along the entire Green Line and the Type 7, 8, 9 and 10 vehicles of the Green Line railcars. *See* Ex. I at pp. 6-9.

Specifically, the Piper GLTPS is a stand-alone, non-vital overlay system with the primary functions of (i) Stopping Green Line Vehicles before they pass a Red Signal (or other Stop signal); (ii) Speed enforcement of Green Line Vehicles to authorized speed limits; (iii) preventing train-to-train collisions on tracks used for passenger service. *Compare* Ex. I at p. 6, *with* Ex. H at §1.1.3. |

20

| Claims 1-8, 10, 12-14 of the '738 patent | Defendants' System |
|---|---|
| | Accordingly, the Piper GLTPS is a system for evaluating vehicle operation compliance. |
| a control signal interface subsystem; and | The GLTPS specified by the MBTA Technical Specifications includes Wayside equipment. Ex. H at § 4 ("Wayside Requirements."). The Wayside equipment interfaces with the existing signal lighting circuits and is a control signal interface system. Ex. H at § 4.1.2 ("The Wayside equipment shall not compromise the safety or reliability of the existing signal system in any way.").<br><br>Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the Piper GLTPS includes a component that meets the Wayside equipment requirements as specified by the MBTA Technical Specifications. *See* Ex. I at p. 6.<br><br>Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that Piper Networks refers to the Wayside equipment as an Anchor and the Anchor interfaces with signal equipment. *See* Ex. I at p. 7. |
| a vehicle-mounted subsystem configured to: | The GLTPS specified by the MBTA Technical Specifications includes Carborne equipment that is capable of being mounted in the Green Line vehicles. *See* Ex. H at § 3 ("Carborne Requirements.").<br><br>Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the Piper GLTPS includes a component that meets the Carborne equipment requirements as specified by the MBTA Technical Specifications. *See* Ex. I at p. 6. |
| a. communicate with the control signal interface | The MBTA requires that "the GLTPS shall monitor all existing Wayside automatic block (ABS), interlocking (controlled |

| Claims 1-8, 10, 12-14 of the '738 patent | Defendants' System |
|---|---|
| subsystem to receive information corresponding to a status of a control signal; | and noncontrolled) and station signals on the Green Line" (Ex. H at § 2.2.1) and that "the GLTPS shall communicate the displayed signal aspects of the monitored Wayside signal to approaching trains." Ex. H at §2.2.2.<br><br>The signal aspect can be "YELLOW," GREEN" and "RED" which corresponds to the status of the control signal. Ex. H at § 4.3.2.<br><br>"RED" indicates STOP, and then proceed after one minute at restricted speed of not greater than 10 MPH to the next signal. *Id.*<br><br>The carborne unit, the vehicle-mounted subsystem, is required to receive communication from the Wayside that the train is approaching a STOP aspect. Ex. H at § 2.2.5.<br><br>Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the Piper GLTPS carborne equipment, the vehicle-mounted subsystem, communicates with the Piper GLTPS Wayside equipment, the control signal interface subsystem, to receive information corresponding to a status of a control signal, as specified by the MBTA Technical Specifications. *See* Ex. I at p. 6. |
| b. determine a rule for behavior of a vehicle according to the information corresponding to the status of the control signal; and | The MBTA requires that "[i]f the Carborne system receives communication from the Wayside that the train is approaching a STOP aspect, the Carborne equipment shall notify the operator of an upcoming STOP condition via visual and audible alarms, and monitor the position of the train with respect to distance from the STOP (distances and timing characteristics to be approved by the MBTA as part of the SFD)." Ex. H at §2.2.5.<br><br>"If the Operator does not initiate braking in sufficient time to ensure the train is brought to a complete stop prior to passing |

| Claims 1-8, 10, 12-14 of the '738 patent | Defendants' System |
|---|---|
| | the STOP aspect, the Carborne system shall request a STOP and continue to annunciate the audible and visual alarms to indicate this state to the Operator." Ex. H at §2.2.6.<br><br>Accordingly, the GLTPS designed in accordance with the Technical Specification determines a rule for behavior, *i.e.*, initiate braking, according to the information corresponding to the status of the control signal, *i.e.*, STOP.<br><br>Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the Piper GLTPS determines a rule for behavior of a vehicle according to the information corresponding to the status of the control signal, at least because it operates as specified by the MBTA Technical Specifications. *See also* Ex. I at p. 3 (Phase 1 provides the Warning System and Phase 2 automatically slows or stops trains if warnings ignored). |
| c. observe operation of the vehicle to evaluate compliance with the rule, | The MBTA requires that "[i]f the Operator does not initiate braking in sufficient time to ensure the train is brought to a complete stop prior to passing the STOP aspect, the Carborne system shall request a STOP and continue to annunciate the audible and visual alarms to indicate this state to the Operator." Ex. H at §2.2.6.<br><br>Accordingly, the GLTPS designed in accordance with the Technical Specification observes operation of the vehicle to evaluate compliance with the rule, *i.e.*, did the Operator initate braking. |
| wherein the control signal interface subsystem comprises an ultra-wideband (UWB) | The MBTA Technical Specification requires that the GLTPS provide reliable methods and technologies of speed sensing and localization to meet the functional requirements of this specification by using, for example, UWB. *See* Ex. H at §§ 3.5.6.1, 3.5.6.2.<br><br>Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the |

| Claims 1-8, 10, 12-14 of the '738 patent | Defendants' System |
|---|---|
| communications component;<br><br>the vehicle-mounted subsystem comprises an ultrawideband (UWB) communications component; and<br><br>the vehicle mounted subsystem and the control signal interface subsystem are further configured to communicate UWB signals carrying data pertinent to evaluating vehicle operation compliance, the data comprising at least one of: a unique ID associated with the vehicle-mounted subsystem, a signal indication, a track number, a | Piper GLTPS Wayside and Carborne equipment comprises an ultra-wideband (UWB) communications component. Ex. I at p. 4 ("Piper will deploy UWB (Ultra Wide Band) for speed and collision warnings.").<br><br>Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the Piper GLTPS Wayside and Carborne equipment communicate UWB signals carrying data pertinent to evaluating vehicle operation compliance the data comprising at least one of: a unique ID associated with the vehicle-mounted subsystem, a signal indication, a track number, a track direction, speed, and direction of travel. *See* Ex. I at p. 4. |

| Claims 1-8, 10, 12-14 of the '738 patent | Defendants' System |
|---|---|
| track direction, speed, and direction of travel. | |

75.     Defendant Piper directly infringes the claims by offering and selling the Piper GLTPS to the MBTA. Defendant Piper directly infringes the claims by making and using the Piper GLTPS, as least as part of the "Design and Production Readiness" demonstration. Defendant Piper indirectly infringes by actively and knowingly aiding and abetting the MBTA in the operation of the Piper GLTPS System with the intent to encourage the MBTA to directly infringe the '738 patent, including by assisting the MBTA in developing the Piper GLTPS system. Further, Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery that Piper has instructed the MBTA as to its use. Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery that the equipment supplied by Piper, as configured by Piper, has no substantial non-infringing use. Further, Piper willfully infringes the '738 based on its prior knowledge of the patent and its infringement.

76.     The MBTA is a direct infringer by its use of the Piper GLTPS System.

77.    Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery that the MBTA willfully infringes the '738 patent, at least based on its prior knowledge of the patent and its infringement.

78.    A reasonable opportunity for discovery is likely to show that Piper is offering its infringing system for sale to other transit agencies and using the MBTA project as a reference to leverage additional sales.

79.    Defendant Piper is also a contributory infringer, because the components sold by Piper for installation in the MBTA GLTPS are customized for the MBTA's unique requirements, are not staple articles of commerce, and have no substantial non-infringing use. A reasonable opportunity for discovery will show that these customized components are material parts of the invention of the '738 patent and Piper sells them despite knowing of the '738 patent and that use of the components infringes the '738 patent.

80.    Metrom is entitled to damages adequate to compensate Metrom for Defendants' infringement, as provided by 35 U.S.C. § 284 and in no event less than a reasonable royalty.

## COUNT II - PATENT INFRINGEMENT, U.S. PATENT NO. 9,043,131 – ALL DEFENDANTS

81.    The allegations in the preceding paragraphs are incorporated herein.

82.    This claim is brought under 35 U.S.C. § 281 and the court has original and exclusive jurisdiction under 35 U.S.C. § 1338.

83.    Metrom is the owner of duly issued U.S. Patent No. 9,043,131 ("the '131 patent") (Ex. A) titled "Collision Avoidance System for Rail Line Vehicles" and has been the owner at all times material to this claim.

84.    Defendant Piper has long known of the '131 patent and its applicability to Piper's system, having received prior notice of the '131 patent and Piper's alleged infringement as early as 2019.

85.    Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the MBTA was previously aware of the '131 patent and its applicability to the Green Line train protection project., having received notice of the '131 patent and its applicability to the system at least through Metrom's prior bid for the project.

86.    Piper challenged the validity of the claims of the '131 patent in an *inter partes* review proceeding before the Patent Trial and Appeal Board ("PTAB") tribunal of the United States Patent and Trademark Office ("USPTO"). The PTAB confirmed the patentability of claims 17-20 of the '131 patent (the "Confirmed Claims").

87.    Where implemented on the MBTA Green Line, Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the Piper GLTPS will infringe at least one Confirmed Claim of the '131 patent, either literally or by equivalence, either alone or as installed in the MBTA system. The following table recites each limitation of at least one claim and the corresponding response in the accused system:

| Claim 17 of the '131 patent | Defendants' System |
|---|---|
| A rail vehicle module mountable on a first rail vehicle, the module comprising: | The GLTPS as specified by the MBTA requires Carborne equipment. See Ex. H at § 2.1.9. The Carborne equipment boxes are specified to "be mounted," (Ex. H at § 2.3.2), in the "(Type 7, Type 8, and Type 9) and planned (Type 10) Green Line vehicle types." Ex. H at §1.1.6; *see also* Ex. H at §3.5.2.1 ("Interior equipment enclosures provided by the contractor and mounted inside the vehicle shall meet the requirements of IEC 60529.").<br><br>Piper was awarded the contract to implement GLTPS as specified in the Technical Specifications. *See, e.g.*, Ex. I at p. 6.<br><br>Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that a device materially similar to the Piper tag meets the requirements of the MBTA specified Carborne equipment.<br><br>Accordingly, the Piper GLTPS includes a rail vehicle module mountable on a first rail vehicle, hereinafter Piper GLTPS rail vehicle module. |

| Claim 17 of the '131 patent | Defendants' System |
|---|---|
| A transponder sensor module comprising: | Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the Piper GLTPS rail vehicle module comprises a transponder sensor module. *See* Ex. I at p. 6. |
| a radio communication unit operable to employ time or flight techniques detect a separation distance between the first rail vehicle and a second rail vehicle; | The GLTPS as specified by the MBTA requires that "[t]he GLTPS shall include a Collision Warning function to provide audible and visual warnings to the Operator of an impending collision when allowable separation distances between trains are violated" (Ex. H at § 2.2.11) and "a Collision Avoidance function to monitor the Collision Warning status and intervene if necessary in the event that allowable separation distances are violated." Ex. H at §2.2.12.<br><br>Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the transponder sensor module of the Piper GLTPS includes a radio communication unit operable to employ time or flight techniques detect a separation distance between the first rail vehicle and a second rail vehicle. *See* Ex. I at p. 6.<br><br>For example, Piper tags found in its RPS "use of Time of Flight (ToF) calculations to determine precise distances." Ex. C at p. 8; *see also id.* at p. 11 ("Because the RPS knows the absolute position of the anchors, the time-of-flight calculations made in real time position the train on the center line spline of the track with centimeter level accuracy."). |
| a first wireless communications antenna operable to send and receive data representing the separation | Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the transponder sensor module of the Piper GLTPS includes a first wireless communications antenna operable to send and receive data representing the separation distance over the air. *See* Ex. I at p. 6.<br><br>For example, Piper tags found in its RPS "use of Time of Flight (ToF) calculations to determine precise distances." Ex. C at p. |

| Claim 17 of the '131 patent | Defendants' System |
|---|---|
| distance over the air; | 8; *see also id.*, at p. 11 ("Because the RPS knows the absolute position of the anchors, the time-of-flight calculations made in real time position the train on the center line spline of the track with centimeter level accuracy."). The Piper tags include UWB antennas and a UWB radio. Ex. C at p. 7. |
| a global positioning system unit operable to receive information from one or more satellites to determine an absolute position of the first rail vehicle; | Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the transponder sensor module of the Piper GLTPS includes a global positioning system unit operable to receive information from one or more satellites to determine an absolute position of the first rail vehicle. *See* Ex. I at pp. 4, 6. |
| a control electronics module comprising a processor in communication with the transponder sensor module; and | Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the rail vehicle module of the Piper GLTPS includes a control electronics module comprising a processor in communication with the transponder sensor module.<br><br>For example, the Piper tags used in its RPS include a tag controller. *See* Ex. C at p. 7. |
| a user interface module including a user interface operable to provide rail vehicle | Section 2.2.24 of the MBTA's specifications for the GLTPS requires that "[t]he GLTPS shall provide means to display the following information to the vehicle Operator" – "The enforced speed limit; this is the speed that is currently being enforced by the GLTPS" and "The supervised train speed; this is the current train speed acquired or calculated by the |

30

| Claim 17 of the '131 patent | Defendants' System |
|---|---|
| information to a vehicle operator and to receive input from the vehicle operator, | GLTPS." Ex. H at § 2.2.24.<br><br>Section 3.3.4.3 of the GLTPS as specified by the MBTA requires provision of "Other Switches or Soft Keys For Operator input of information such as degraded brake conditions or train length, as required by Section 2." Ex. H at §3.3.4.3.<br><br>Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the rail vehicle module of the Piper GLTPS includes a user interface module including a user interface operable to provide rail vehicle information to a vehicle operator and to receive input from the vehicle operator. |
| wherein the rail vehicle module communicates with a second rail vehicle module mountable on the second vehicle to detect a separation distance between the first rail vehicle and the second vehicle. | The GLTPS as specified by the MBTA requires that: "[t]he Carborne equipment shall be able to record internal signals and events and those acquired from other Carborne systems." Ex. H at §3.10.1.<br><br>Further, "[t]he GLTPS shall include a Collision Warning function to provide audible and visual warnings to the Operator of an impending collision when allowable separation distances between trains are violated." Ex. H at §2.2.11.<br><br>Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery, that the rail vehicle module of the Piper GLTPS communicates with a second rail vehicle module mountable on the second vehicle to detect a separation distance between the first rail vehicle and the second vehicle. |

88.    Defendant Piper directly infringes the claims by offering and selling the

Piper GLTPS to the MBTA. Defendant Piper directly infringes the claims by making

and using the Piper GLTPS, as least as part of the "Design and Production Readiness" demonstration. Defendant Piper indirectly infringes by actively and knowingly aiding and abetting the MBTA in the operation of the Piper GLTPS System with the intent to encourage the MBTA to directly infringe the '131 patent, including by assisting the MBTA in the development of the Piper GLTPS system. Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery that Piper has instructed the MBTA as to its use. Further, Piper willfully infringes the '131 patent based on its prior knowledge of the patent and its infringement.

89.    The MBTA is a direct infringer by its use of the Piper GLTPS System.

90.    Metrom believes, or believes it will likely have evidentiary support after a reasonable opportunity for discovery that the MBTA willfully infringes the '131 patent, at least based on its prior knowledge of the patent and its infringement.

91.    A reasonable opportunity for discovery is likely to show that Defendant Piper is offering its infringing system for sale to other transit agencies and using the accused system as a reference design.

92.    Defendant Piper is also a contributory infringer, because the components sold by Piper Networks for installation in the MBTA GLTPS are customized for the MBTA's unique requirements, are not staple articles of

commerce, and have no substantial non-infringing use. A reasonable opportunity for discovery will show that these customized components are material parts of the invention of the '131 patent and Piper sells them with despite knowing of the '131 patent and that use of the components infringes the '131 patent.

93.     Metrom is entitled to damages adequate to compensate Metrom for Defendants' infringement, as provided by 35 U.S.C. § 284 and in no event less than a reasonable royalty.

**JURY DEMANDED UNDER FED. R. CIV. P. 38**

Metrom demands a jury on all issues so triable.

**PRAYER FOR RELIEF**

Metrom requests the following relief:

1.     A preliminary injunction preliminarily enjoining Defendants, their principals, officers, directors, employees, agents, successors, assigns, and any persons in active concert with them from proceeding with the installation of the infringing GLTPS systems;

2.     A judgment that Defendants have infringed one or more claims of the asserted patents;

3.     A judgment that Defendants' infringement was willful;

4.     An accounting for damages, including all compensatory and punitive damages as may be allowed by statute or law, including under 35 U.S.C. § 284;

5.     A judgment and order requiring Defendants to pay Plaintiff its damages, costs, expenses, and prejudgment and post-judgment interest for Defendants' infringement of the asserted patents;

6.     An award to Plaintiff for enhanced damages resulting from Defendants' deliberate, willful, and bad faith conduct, as provided under 35 U.S.C. § 284;

7.     An award to Plaintiff of its reasonable attorney fees, as provided under 35 U.S.C. § 285;

8.     A permanent injunction enjoining Defendants, their principals, officers, directors, employees, agents, successors, assigns, and any persons in active concert with them from infringing, directly or indirectly, the asserted patents during their remaining term, including immediately ceasing all use, marketing, offers for sale, sales, and support of systems covered by the patents, under 35 U.S.C. § 283;

9.     An order requiring Defendants to notify any United States transit agency to which Defendants submit a bid that includes UWB train control equipment of this Court's order and injunctions, and to file a quarterly report with the Court certifying compliance with the Court's injunction.

May 21, 2025                          /s/ Philip C. Swain
                                   _____
                                   Philip C. Swain
                                   Law Office of Philip Swain, LLC
                                   114 Pine Hill Lane
                                   Concord, Massachusetts 01742
                                   (617) 365-4844
                                   pcs@philswainlaw.com

                                   Gregory C. Schodde (PHV to be Submitted)
                                   Rajendra A. Chiplunkar (PHV to be Submitted)
                                   Christian H. Hallerud (PHV to be Submitted)
                                   McAndrews, Held & Malloy, Ltd.
                                   500 West Madison Street, Suite 3400
                                   Chicago, Illinois 60661
                                   (312) 775-8000
                                   gschodde@mcandrews-ip.com
                                   rchiplunkar@mcandrews-ip.com
                                   challerud@mcandrews-ip.com

                                   *Attorneys for Plaintiff, Metrom Rail, LLC*